FILED

2005 Dec-02  AM 09:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

GREG GOLDSMITH,            )
)
         Plaintiff,          )
)
v.                        )     CV-03-RRA-1018-S
)
BAGBY ELEVATOR COMPANY, INC.,  )
)
         Defendant.        )

## REPORT AND RECOMMENDATION
### (Re Defendant's motion for summary judgment, ct. doc. 21)

The plaintiff, a black  man, asserts several discrimination claims against his former employer, Bagby Elevator. The plaintiff claims he was denied a job in the "field" because of his race; he was treated differently from a white employee when he was given a written warning because of his race and in retaliation; he was fired because of his race and in retaliation for having filed an EEOC complaint; and he was made to work in a racially hostile work environment.[1] Before the court is the defendant's motion for summary judgment as to all claims. The ruling on this motion will be decided on the parties' arguments and the specific summary judgment evidence cited in the parties' briefs in support of and in opposition to the defendant's motion.[2]

---

[1]The plaintiff states that he agrees to the dismissal of his defamation claims.

[2]Rule 56©) of the Federal Rules of Civil Procedure "saddles the non-movant with the duty to 'designate' the specific facts in the record" supporting his claim. *Jones v. Sheehan, Young& Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996).  "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Id.; see also Resolution Trust*, 43 F.3d at 599 ("There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.")

<u>Summary Judgment Standard</u>

Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to  judgment as a matter of law. *Federal Rules of Civil Procedure*, Rule 56. The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc*., 929 F.2d 604 (11th Cir. 1991).  Once that initial burden has been carried, the non-moving party may not merely rest upon his pleadings, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986);  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

<u>Evidence</u>

The summary judgment evidence set out herein is the result of synthesizing the parties' submissions of facts,  resolving any conflicts in the evidence in favor of the plaintiff, the non-moving party.[3]  Some of the inadmissible hearsay and immaterial facts have been omitted and some have been stated in the court's statement of the evidence.

---

[3]There should not have been so many "disputes" of the evidence for the court to check. Statements of fact should state the evidence accurately and fully. If the evidence is in conflict, only the evidence favorable to the plaintiff should be included. Inadmissible matter, such as hearsay or statements of opinion, should not be included in the parties' submissions.

On April 6, 1998. Defendant Bagby hired the plaintiff, Greg Goldsmith, a black man, to work in its shop, primarily as an elevator fabricator. Sometimes, the plaintiff helped put together other manufacturers' elevators, or he worked on commercial gates, commercial doors, dumb waiters, elevettes, and stair chairs. The plaintiff received several raises. His last raise was to $15.00 an hour on February 21, 2000, and he was designated as a lead man at that time.  His employment with Bagby ended on June 7, 2002. The parties have divided the evidence by claims.

*Job Discrimination*: The defendant employed field workers as well as shop workers. Elevator mechanics and their helpers hold what are called "field positions."  The field jobs are governed by a collective bargaining agreement (CBA) between the International Union of Elevator Constructors (IUEC) and the defendant. These positions are filled by persons who have applied for them through the union's local, Local 24. Applicants place their names on a hiring list which is kept and maintained by the local.  The hiring list can include union and non-union members. When presenting names to an elevator company, however, union members  are given priority over non-members.  Larry Gardner served as the business agent for Local 24 from 1988 until February of 2002.

John Bowden was the defendant's purchasing manager. He was responsible for interacting with the union.  The plaintiff states in his factual submissions that one of Bagby's field foremen, Jim Ward, told the plaintiff that he needed someone like the plaintiff in the field.[4] According to the plaintiff and Larry Gardner, at some unknown point in time the

---

[4]The defendant objects, asserting that Ward did not so testify on page 32 of his deposition. Ward testified, "at one point [I] had a conversation with Mr. Goldsmith about — about going from

plaintiff submitted his name to Gardner, who placed the plaintiff's name on Local 24's field position hiring list. Being on that list meant that the plaintiff could be presented to and hired by other elevator companies as well as Bagby.  Gardner presented elevator companies with hiring lists containing three or more applicants.    Gardner told the plaintiff that if an elevator company called and his name was next on the list, he would go. Field Foreman Ward testified that he may have told Bowden that he would hire the plaintiff or let the plaintiff work with him as a helper.[5]  Ward believed that the plaintiff was qualified to work in the field and that his shop experience would help him. Ward, of course, did not have the authority actually to hire anyone. Ward's supervisor was Donnie Hicks. The plaintiff spoke to Hicks about a field position. Hicks told the plaintiff that he (the plaintiff) needed to go to the union hall.

Union rep Gardner testified that applicants with knowledge of electricity and electronics were given preference by those who did the hiring. Gardner presented the plaintiff's name to Bagby for a field job. Gardner told the plaintiff he was one of the most experienced and qualified applicants. Bowden told the plaintiff he had already hired someone, apparently James Price, a white man. Gardner testified that Price had no experience in the elevator industry.  Gardner further opined that other white persons were hired who

---

the shop to the field, and [I] suggested that [the plaintiff] go apply at the union hall." This testimony fairly supports the statement set out by the plaintiff. Moreover, the plaintiff himself testified, "I could use somebody like you out in the field." The defendant also complains that the plaintiff is mistaken to the extent he intends to represent Ward as management. The plaintiff's statement of fact makes no such implication, but clearly states that Ward is a foreman.

[5]The plaintiff's submission of fact states that Ward *told* Bowden, Bagby's purchasing manager, that Ward would hire the plaintiff as a helper or allow the plaintiff to work with him. In its objections, as the plaintiff correctly points out, Ward stated he *may* have said that. Ward also elsewhere testified that he did not have the ability to hire.

4

were not as qualified as the plaintiff. Gardner stated that in his "opinion [Bagby] did not put Mr. Goldsmith to work into the field because he was black."[6] The plaintiff does not know the qualifications of any of the white individuals hired over him for field jobs.

Each elevator company had the right to hire its own field employees.  Bowden, who did the hiring for Bagby, testified that electrical knowledge is only one of the factors the defendant considers. Moreover, Ron Farley, a white shop foreman, and David Walker, a white shop fabricator, as well as other white shop employees, asked Bowden about getting field jobs.[7] Bowden told them that shop employees were not allowed to move to field positions. Arthur Steber, the defendant's president, testified that a shop employee would not be automatically excluded from working in the field, but that such a move was not favored. Steber explained why: "Because good employees are hard to find, and our shop employees work for the company. We have to find them on our own. Union — we hire for field from the Union. They provide us with a labor pool. All we have to do is call them and say, 'Send me help.'" *Steber Deposition*, p. 98.  During his ten years of employment with the defendant, Bowden and Field Foreman Ward have no knowledge of any Bagby shop employee, of whatever race, moving from a shop position to a field position.  In fact, Bagby hired a black man, Ricky Gross, for a field position.

Webster Roberts became financial secretary and representative for Local 24 of the International Union of Elevator Constructors on January 2, 2002.  After the plaintiff left the

---

[6]Gardner's opinions and conclusions are not admissible and should not be considered.

[7]There is no evidence, however, that they ever actually applied for field positions.

defendant, Roberts  arranged for the plaintiff to be interviewed by Schindler Elevator for a field position because the plaintiff's name was at the top of the union's hiring list. The plaintiff interviewed with Schindler Elevator, who then advised the union that it was interested in hiring him.  The plaintiff decided, however, that he did not want the field position because there was more job security at Sign Builders. The plaintiff went with Sign Builders.  The plaintiff's pay of  $11.50 per hour at Sign Builders has never varied.[8]

*Racially Hostile Work Environment/Harassment*: Throughout the plaintiff's employment, Bagby had established and publicized written policies promoting equal employment opportunities and forbidding unlawful discrimination and harassment, including provisions that instructed employees to report perceived instances of discrimination or harassment to one of various members of management. The  plaintiff knew that Bagby had a policy against harassment and that he should complain to management about any perceived instances of harassment. The defendant never provided actual training to its employees concerning improper racial conduct.

In September of 2000, a black employee, Curlee Thomas, told the plaintiff that Ron Farley, a white shop superintendent, said to Owen Edwards, a white employee, "if I gave those niggers a banana, would they swing from a tree?" The plaintiff complained to Arthur Steber about the comment. The plaintiff testified that Steber responded to the plaintiff by saying, "That's just the way Ron is. You just have to accept it."[9] Steber, however, who

---

[8]Schindler Elevator would have paid the plaintiff about the same wages that he makes at Sign Builders.  This line of evidence is immaterial.

[9]The defendant objects that Steber testified he does not remember saying this. All that matters

testified that he had never heard Farley use racially offensive comments anywhere, conducted an investigation. Steber interviewed Thomas and Edwards. Steber determined that Ron Farley had indeed made the statement.[10] The investigation, however, revealed only this single incident of Ron Farley using racially offensive language in the workplace. Steber spoke only to the persons involved, and not to every employee under Farley's supervision.

A written reprimand was issued to Ron Farley, and he was instructed not to use racially offensive language again. Moreover, Steber went to the shop everyday and observed nothing in Farley's behavior indicating Farley treated white and black employees differently. Steber also monitored Farley's evaluation of employees and employee raises. There is testimony that all shop employees were reminded in a meeting that company policy forbids engaging in racially offensive conduct.[11] Also, in December of 2000, the defendant issued a revised personnel manual that reiterated its policies against racially insensitive conduct. Steber testified that "if he would have made another racial slur it would have been his second offense, and we would have most likely let him go."[12]

The only racial remark the plaintiff claims to have heard uttered by a white shop co-worker was by David Walker. Walker stated that he did not like black people. Tony Jemison,

_____

for summary judgment purposes of course is that there is evidence that he did.
    [10]Jemison had heard Farley make other racially derogatory comments.

    [11]The plaintiff testified that he does not remember such a meeting.

    [12]On another occasion, time unknown, the plaintiff overheard Ron Farley use the word "nigger" while Farley was speaking to "Howard" of Bagby's Mobile office via telephone. According to the plaintiff, Farley said, "Those niggers are crazy. They're the dumbest niggers I've ever seen in my life." This is the only time the plaintiff personally heard Farley use the word "nigger." The plaintiff never complained to anyone about this incident.

a black man, and Larry Isbell, a white man, were also present when Walker made this statement. Neither the plaintiff nor anyone else made a complaint to management about this comment. Walker made several other racial comments. He told a black worker, Tony Jemison, "Monkey, I'm going to put you in your cage." Jemison repeated the "monkey" comment to the plaintiff. Larry Isbell, a white fabricator/welder, heard Walker call Jemison a "monkey" a "couple of times." Isbel testified, however, that Walker and Jemison were "real good friends," and that Walker's comments were made while the two men were "just joking with each other" and calling each other a "mother f---er." Isbell opined that Jemison was not upset by the "monkey" comment and that the exchange between the two "was all a big joke. Just two friends going at each other, you know." Indeed, Jemison himself laughed during the exchanges and never complained to anyone about Walker using the term "monkey." The plaintiff alleges that David Walker once threatened "to make my son an orphan."[13] The plaintiff never complained to management about David Walker, but he filed an EEOC charge and lawsuit about such language. Jemison never complained to Bagby about any of the racial statements allegedly made in his presence by David Walker or Ron Farley. Jemison testified, however, that, at some unspecified time, he tried once to complain to Steber about Farley's racial comments, but Steber kept walking and said, "I heard." Steber testified that he neither knew nor heard that David Walker had used racially offensive language in the workplace.

---

[13]On October 5, 2001, the plaintiff filed an EEOC charge. He claimed that the defendant denied him a position in the field because of his race. The plaintiff also claimed that he had been subjected to a racially hostile work environment; he named Farley as the harasser, and alleged that he complained to Steber to no avail.

Again, the only racial comment the plaintiff himself heard was Walker's statement that he did not like black people.

*Written Warning:* The plaintiff alleges that he suffered discrimination with respect to a calendar that was used by employees to notice periods of vacation or medical leave. According to the plaintiff, while shop superintendent Ron Farley was out, employees were to inform Jerry Wilmas when they would be off work.  The employees were also to note their upcoming time off on a calendar that was situated by the time clock. The plaintiff and David Walker, a white employee, informed Wilmas they were going to be off, and they noted their upcoming absences on the calendar.  Allen Webster, who passed out work orders, noticed that Walker was absent and asked where he was. Webster said that Walker had not informed anyone in the front office that he would not be coming in that day. The next day the plaintiff did not come to work.  When the plaintiff returned to work, Bowden asked him why he had not informed anyone he would not be in. Bowden issued the plaintiff a written warning. Bowden told the plaintiff that Walker had called in before not showing up. The source of Webster's knowledge that Walker had not called in, and the source of Bowden's knowledge that Walker had called in, are unknown.  However, it was Bowden who issued the written warning to the plaintiff, and it was Bowden's belief that Walker had called in, and, therefore, there was a difference between the plaintiff's situation and Walker's situation. Further, Larry Isbell, a white employee, was also disciplined for following the old calendar protocol while Jerry Wilmas was overseeing the shop. Isbell's pay was docked three hours because it was determined that he improperly used the calendar for a doctor's visit. The plaintiff received

a written warning, but he did not suffer loss of wages, suspension, different working conditions, different hours, or any other detriment as a result of this calendar incident.

*The Plaintiff's Termination/Retaliation*:  On October 5, 2001, the plaintiff filed his only charge of discrimination with the EEOC during his employment with the defendant. On June 6, 2002, the defendant's elevator designer, Allen Webster, presented the plaintiff and other shop employees with a binding arbitration agreement entitled, "Dispute Resolution Agreement."  The plaintiff stated that Webster "[j]ust said that we had to sign them." All of Bagby's non-union employees, including office employees and members of management, were required to execute the agreement.[14]  The plaintiff read the document and consulted with his attorney. On June 7, 2002, the plaintiff was told by someone at Bagby that he would be deemed to have resigned his position unless he signed the arbitration agreement.  Later that day, the plaintiff obtained a proposed revised "Dispute Resolution Agreement" from his attorney, which excluded any pending claims.  Also that day, the plaintiff spoke with Larry Isbell and the two of them decided that they were not going to sign.  The plaintiff then attended a meeting with Isbell, Allen Webster, Farley and Steber. The plaintiff asked Steber whether Bagby would agree to remove the clause about past and present claims, and stated that he would sign the agreement if this language were removed. Steber said that the exclusion language would not be added to the agreement, and that refusal to sign would be construed as the employee's resignation. The plaintiff and Larry Isbell both informed

---

[14]The plaintiff points out that Donnie Hicks, a supervisor, testified that he did not recall whether he signed.

management that they would not sign the agreement.[15]  At the end of this June 7 meeting, the

plaintiff concluded that his employment had ended. On June 7, 2002, the plaintiff signed a

second charge of discrimination against Bagby, contending that he was terminated because

of his race and in retaliation for filing a second EEOC complaint.[16]  It is the plaintiff's "gut

feeling" that he was fired in retaliation for filing the EEOC complaint.

<u>Discussion</u>

*Job Discrimination*: In order to establish a prima facie case of job discrimination under

*McDonnell Douglas*, the plaintiff must show that he was qualified for a job in the field but a

white person was selected instead. Assuming the evidence supports such a showing in this

case, the defendant has articulated a legitimate, non-discriminatory reason for not selecting

the plaintiff. Although Steber testified that shop workers were not automatically excluded

form consideration, it is clear that it was virtual policy not to move shop workers to the field.

The articulated reason for this policy was that good shop employees, who actually worked

---

[15]The plaintiff disputes this statement, stating that "Steber did not tell the plaintiff that the defendant could not accept changes to the document," and the plaintiff cites the same pages in his own deposition as did the defendant. The plaintiff also cites Steber's deposition to show this statement is not correct.  The plaintiff's deposition shows that he testified that Steber said that *he (Steber)* could not accept the plaintiff's changes, and Steber's deposition shows that he said that *there could be* no changes.

[16]Isbell considered himself to have lost his job by not signing. Later, Isbell encountered Johnny Bowden.  Bowden told Isbell that he had signed the agreement, and that the company did not mean any harm by it and he was not worried about it.  Bowden asked Isbell to think about signing the agreement.  Isbell then realized that he could confer with the business agent at Local 92 Ironworkers Union.  The Ironworkers business agent suggested that Isbell sign Bagby's arbitration agreement and informed him that his union has to sign arbitration agreements when it does work for Alabama Power. Isbell returned to Bagby and executed the arbitration agreement the same day. Members of management, including Arthur Steber, Johnny Bowden, and Donnie Hicks, signed the agreement. The plaintiff points out that Hicks did not recall if he signed.

for the defendant, were hard to find, and it was the defendant who had to do the finding. On the other hand, the union supplied people for field positions; all the defendant had to do was tell the union that someone was needed and the names of people who wanted the job were supplied. There is evidence that this policy was consistent applied, while there is no evidence that it was not. While it might not have been fair to those people who worked in the shop, such unfairness had nothing to do with race. Finally, there is insufficient evidence to create an issue of pretext. Bowden made the hiring decisions for the field jobs, and there is no evidence that he acted out of racial bias.

*Harassment*:  To demonstrate racial harassment, the plaintiff must show: (1) that he belongs to a protected group; (2) that he has been subjected to unwelcome racial harassment, (3) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment, and (4) that there is a basis for holding the employer liable.  *See Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir. 2000).  With respect to the third factor, the plaintiff must show that the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Harris v. Forklift Systems, Inc.*, 114 S.Ct. 367, 370-71 (1993).  "The racial slurs allegedly spoken by co-workers had to be so 'commonplace, overt, and denigrating that they created an atmosphere charged with racial hostility.'" *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995).  The court should consider the "frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with plaintiff's

performance at work." *Id.* at 1521-22.  As to the effect on a plaintiff's ability to do his job,

the Seventh Circuit in *Rodgers v. Western-Southern Life Insurance*, 12 F.3d 668 (7th Cir.

1993), set out an objective and subjective test, stating, "[a]s we explained in *Brooms*, this

conjunctive approach allows us to consider 'the likely effect of a defendant's conduct upon

a *reasonable* person's ability to perform his or her work and upon his or her well-being as

well as the *actual* effect upon the *particular* plaintiff bringing the claim.' 881 F.2d at 419

(emphasis added)." *Rodgers,* 12 F.3d at 674. The court pointed out that "a supervisor's use

of the term ["nigger"] impacts the work environment far more seriously than use by co-

equals." *Id*. at 675. That court also stated that the *district sales manager's* comment that

"'black guys are too fucking dumb to be insurance men' would have adversely affected a

reasonable employee's ability to perform his or her work." *Id*. The trial court in *Rodgers*

> determined that Mann's racist comments "had a profound psychological effect upon
> Rodgers." More specifically, the court found that Rodgers was "deeply offended" by
> Mann's use of the term "nigger" and took Mann's comment about the intelligence of
> Rodgers' black sales agents to imply that Rodgers himself was not qualified to be an
> insurance agent because of his race. The court added that Mann's race-neutral insults
> further reduced Rodgers' self-esteem and ability to work, "making Mann's racist
> references, epithets, and comments even more lethal to Rodgers' ability to perform
> his job."

*Id*. at 676. Once racial harassment has been established, in order to hold the employer liable

the plaintiff must show that the racially hostile environment was created by one with

supervisory authority over him, or that the defendant, upon learning of the discriminatory

behavior, failed to take appropriate action.  *Burlington Industries, Inc. v. Ellerth*, 524 U.S.

742, 765 (1998)  An employer is strictly liable for harassment if the harasser was a supervisor

and the supervisor took a tangible employment action against the plaintiff as a result of the

13

harassment. *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000). "When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." *Burlington Industries*, 524 U.S. at 765. "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* Also, an employer is insulated from liability under Title VII for a hostile work environment racial harassment claim "when the employer has adopted an anti-discrimination policy that is comprehensive, well-known to employees, vigorously enforced, and provides alternate avenues of redress." *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir. 1997). Again, no affirmative defense is available to the employer, however, "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion or undesirable reassignment." *Burlington Industries, Inc. v. Ellerth*, 524 U. S. at 808. The Eleventh Circuit has stated that "[a]n employer is directly liable for hostile environment sexual harassment if it knew, or reasonably should have known, of the harassment and failed to take prompt remedial actions." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997). *See also Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 11316 (11th Cir. 1989). "A plaintiff can prove that the employer had knowledge of the harassment by showing that she complained to higher management or by showing that the harassment was so pervasive that the employer can be charged with constructive knowledge of the harassment." *Allen*, 121 F.3d at 647. *See also Huddleston v. Roger Dean Chevrolet,*

14

*Inc.,* 845 F.2d 900, 904 (11th Cir. 1988). Finally, "[w]ithin the totality of circumstances, there is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law to state a claim." *Rodgers v. Wester-Southern Life Insurance*, 12 F.3d at 674. All circumstances must be considered.

Under the cited law, it is concluded that the plaintiff does not have a viable racial harassment or hostile work environment claim. The defendant had an established and publicized written policy condemning racial harassment. The plaintiff knew that it was incumbent upon him to report improper racial conduct. The only racial remark the plaintiff claims personally to have heard was Walker's statement that he did not like black people. The plaintiff, however, complained only about one comment, which was the Farley statement, repeated to the plaintiff, about whether a "nigger" would swing from a tree if he were given a banana. The plaintiff's complaint was investigated by Steber himself, and the defendant took the corrective actions previously set out. It is deemed that the defendant acted promptly and sufficiently to correct this problem. There is no evidence that either Farley or Walker thereafter made another racist comment. To the extent that witnesses have testified that they heard racial remarks made by Farley and Walker, which were repeated to the plaintiff, that testimony is proper evidence. However, the fact that the comments were not made to the plaintiff minimizes any effect such comments might have had on him personally, concerning which there is no evidence, and the plaintiff's work did not suffer as a result. Finally, the actions of Farley or Walker did not culminate in a tangible employment action against the plaintiff. Thus, it is concluded that the plaintiff's workplace was not permeated with discriminatory intimidation, ridicule, and insult that was so severe that it resulted in an

alteration of the plaintiff's employment.  The remarks in question were ignorant and have no place in the workplace, even if they were made in jest, as the evidence suggests that some of Walker's comments were. All such comments should be condemned, as they were by the defendant, and steps should be taken to assure that such remarks would not be made again, as the defendant did.

*Retaliation*: To establish a *prima facie* case of retaliatory discharge, the plaintiff must show that 1) he engaged in statutorily protected activity, 2) an adverse employment action occurred, and 3) that there was a causal link between the participation and the adverse employment action.  *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir. 1990).  To show a causal connection the plaintiff must show that "the protected activity and the adverse action were not wholly unrelated." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

The plaintiff's first EEOC charge was filed on October 5, 2001, eight months before the time the company made signing the resolution agreement a condition of employment.[17] The requirement was imposed on white as well as on black workers. There is no evidence that any white worker refused to sign the agreement and was not terminated.

*The calendar incident/written warning*: The evidence recited by the parties is insufficient to sustain a finding that the plaintiff was treated differently from similarly situated white employees. Neither will such evidence support a claim of retaliation.

<u>Recommendation</u>

---

[17]The plaintiff's second EEOC complaint was filed after his termination.

16

Wherefore, it is hereby recommended that Bagby's motion for summary judgment be granted and all claims against it dismissed.

DONE this 2nd day of December, 2005.

ROBERT R. ARMSTRONG, JR.
UNITED STATES MAGISTRATE JUDGE